# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 30, 2011

## STATE OF TENNESSEE v. SUSAN RENEE BISE

**Direct Appeal from the Criminal Court for Greene County**
**No. 09-CR-353     John F. Dugger, Jr., Judge**

---

**No. E2011-00005-CCA-R3-CD - Filed September 15, 2011**

---

The defendant, Susan Renee Bise, was convicted by a Greene County Criminal Court jury of facilitation of aggravated burglary and two counts of theft of property in an amount greater than $1000 but less than $10,000, all Class D felonies, and was sentenced to an effective term of three years as a Range I offender.  On appeal, she challenges the sufficiency of the evidence of her theft convictions and the sentence imposed by the trial court.  After review, we affirm the defendant's convictions, but we conclude that the trial court inappropriately enhanced the defendant's sentences.  Therefore, we modify the defendant's sentences to the minimum in the range of two years.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, J., filed a concurring in part and dissenting in part opinion, and JOHN EVERETT WILLIAMS, J., concurred in results only.

Charles C. Harrison, Jr., Pigeon Forge, Tennessee, for the appellant, Susan Renee Bise.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and J. Chalmers Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## <u>FACTS</u>

This case arises out of the defendant's involvement with her son and a friend in breaking onto the property of the victim, James McElroy, and taking tools and various other

items of value sometime in September 2008. As a result, the defendant was indicted on two counts of aggravated burglary and two counts of theft of property in an amount greater than $1000 but less than $10,000.

## State's Proof

At trial, the victim testified that he traveled for his job six to nine months out of the year and, when he was not traveling, he split his time equally between a home in Virginia and a "work in progress" home in Greene County, Tennessee. There was a gate across the driveway to the house at the main road, then, once on the driveway, one had to drive 900 feet, "do a hairpin turn," and then proceed another 500 feet before reaching the house. The gate across the driveway was "a standard metal farm gate . . . on four by four posts," which the victim secured with a double chain padlock and kept locked when he was not there. The house was approximately eighty percent complete, and the victim still had "a lot of tools and that kind of stuff there."

In September 2008, the victim was gone from the Greene County home for "a couple of days." When he returned to the house around 2:00 or 3:00 a.m., he noticed the gate was lying in the driveway and "the four by four posts on either side were snapped off at approximately ground level." The victim attempted to call the sheriff's department but, having no cell phone signal, proceeded up the driveway. The victim inspected the house and noticed that the door jamb of the door leading from the garage into the house had been shattered. Once inside, he noticed a "pile of merchandise," including a planer and "a lot of electrical wire," from other areas of the house that appeared to have been gathered to be loaded.

The victim subsequently was able to call the sheriff's department, and an officer responded to conduct an investigation. After thoroughly reviewing the contents of his house, the victim gave the responding officer a list of the missing items. The victim explained that "anything that was of value was taken," including a bag of over $100 of loose change, archery equipment, ammunition, an iPod, a table saw, ladders, a fifteen-foot pole saw, an air compressor, a weed eater, beer, and the cooler containing the beer. The total value of the items taken was over $1000. The total from the list he gave to law enforcement was $7460. Most of the items taken were not more than two or three years old. The victim said that many of the items were bulky, and he believed that whoever took the items would have had to make at least two trips to haul them away.

The victim said that only four items of property were returned to him, namely a saw, a bench vise, a drill press, and a table saw. However, only one of the recovered items was usable; the others were bent, rusted, or broken. He estimated the value of the recovered

items at $950. The victim stated that he never had any workers from Mexico working on his house, but he thought that the roofing contractor may have utilized two Latino workers at his house in 2005. None of the workers left any of their tools at his house, and all the tools that were stolen belonged to him.

Chad Warner testified that he was presently serving a sentence in jail for filing a false report related to his telling police officers that he had not been driving a vehicle that was involved in an accident. Warner had previously been charged with an offense after he was involved in a fight with the defendant and her son, Jason Bise, on February 11, 2009. Warner cut the Bises with a box cutter, and he was also cut.

Warner said he got angry with the defendant and her son after the fight because they refused to drop the charges against him, so he decided to give a statement to Detective Randolph concerning things he knew about them. Warner told Detective Randolph about an incident when the defendant, and her husband and son, Jason Bise, Sr. and Jr., respectively, came to his house and tried to "sell some stolen goods." The items included a table saw, a wet saw, some chain saws, and a dirt bike. One of the saws was orange and silver. The defendant and her family told Warner that they had stolen the items "out of the hollow down next to Warrensburg [Road]. They run over a gate and went back through there[.]" They told him that a Mexican man named Domingo had been with them as well. Warner did not buy any of the items. Warner knew that Jason Bise, Sr. did some construction work for which he "[p]robably" had some tools; however, Warner said that he had been to the Bise home "[a] few times" before and had never seen any tools there "[b]esides the stolen chain saws and stuff."

James Gammons, Jr. testified that he lived 4.3 miles from Warrensburg Road and was driving his tractor down a road close to his house on February 13, 2009, when he saw "property along the edge of the road down below the guard rail along the river." Gammons first thought the property was "junk" but, upon further inspection, realized it was "good stuff" and took the items to his house. The items appeared to be in "working order but . . . were somewhat dented." Because the items were "in good shape," he thought they might be stolen and called the sheriff's department. An investigator came to his house to take a report and then took possession of the property. The four items were a table saw, a bench top drill press, a miter saw, and a table vise. He did not think the items had been in the location very long because they did not have any "dew spots" or rust on them.

Detective James Randolph with the Greene County Sheriff's Department testified that he was assigned to investigate the burglary and theft from the victim's house. He searched pawn shops, among other things, but was unable to locate any of the stolen items. Later, in 2009, Detective Randolph was involved in the investigation of a fight between Chad Warner

and the defendant and her son. On February 27, 2009, Warner sent a request from jail to talk to Detective Randolph, and Warner gave Detective Randolph a statement concerning the burglary and theft that had taken place at the victim's house. Based on information provided by Warner, Detective Randolph located a stolen motorcycle at the defendant's son's house, which helped corroborate Warner's statement.

Detective Randolph talked to the defendant's son and learned that two other people had been involved in the burglary, including a Hispanic man who had been deported. Detective Randolph then talked to the defendant, who gave the following statement on March 25, 2009:

> Back in September of 2008, me and my son Jason Bise, Jr., and Hosea Hernandez went to a house in Shefey Hollow, and Jason was driving. Jason ran over a gate that was locked and tore it down. I sat in the truck and Jason and Hosea went in the house and took a bunch of stuff. When we got back to the house[,] I told them I didn't want anything to do with this and went in the house. We went to get some beer later tha[t] night and I passed out, and Jason and Hosea said they went back to the house in Shefey Hollow again and took some more stuff. Some of the stuff was at my house in the root cellar when Jason got cut. I told him to get rid of . . . them, and he took them down on Pate's Hill Road and set them out along the road.

The defendant signed the statement in Detective Randolph's presence. Detective Randolph clarified that the defendant told him she was passed out in the truck when her son and Hernandez went to the victim's house the second time. The defendant lived on Warrensburg Road, approximately four miles from where Jack Gammons recovered the four items. Detective Randolph said the defendant was charged with two counts of aggravated burglary and two counts of theft because "[t]hey said there was two trips."

**Defendant's Proof**

The defendant testified that on the day of the burglary, she, her son, and Hosea Hernandez went swimming. They were all drinking while swimming but were not drunk. Hernandez then asked the defendant's son "if he would take him to this address to pick up his personal belongings," so they "went to this house on Shefey Hollow" around dusk. The defendant stated that her son said he was going to run over a gate, but she told him not to do it. However, her son ran over the gate, and she asked him to take her home but he refused. She remained in the truck while her son and Hernandez went inside, and then they went home. After they returned home, the defendant "told them that [she] didn't want no part of anything that they was doing" and went inside to sleep. The defendant said that she

did not go back out with her son and Hernandez.

She admitted that she let her son store some items, namely tools, in her root cellar after the incident. However, she claimed that when she found out that the items were stolen, and not Hernandez's belongings, she told her son to remove the tools. The defendant said that she gave a statement to Detective Randolph, but she did not tell him that she had believed the tools belonged to Hernandez because Detective Randolph "never asked" and she was afraid of the police. The defendant denied that she went with her son and Hernandez on the second trip to the victim's house. She said that none of the stolen items from the second trip were stored at her house.

The defendant testified that she knew Chad Warner because he had worked for the family's construction business for approximately one month. However, Warner and the defendant's son got into a fight, during which Warner cut the defendant's son with a box cutter. The defendant got into Warner's truck to try to get help for her son, but Warner pulled a gun on her son, threatening to shoot if she did not get out of the truck. The defendant complied, and Warner hit her as he drove off. The defendant dragged her son to her house and called 911. She pressed charges against Warner after the incident. Warner asked her to drop the charges, but she refused because she "about lost" her son. The defendant denied that she ever went to speak with Warner.

The defendant admitted that some of the stolen belongings remained in the root cellar at her house from the time they were stolen in September 2008 until February 2009 after the incident with Warner. However, she denied that the reason she told her son to remove the stolen property only after the incident with Warner was because she was concerned that Warner would tell the police about the stolen property.

After the conclusion of the proof, the jury convicted the defendant of one count of facilitation of aggravated burglary, as included in the indictment, and two counts of theft of property valued more than $1000 but less than $10,000. The jury found the defendant not guilty of the remaining charge of aggravated burglary.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of evidence convicting her of the two counts of theft of property. She argues that, with regard to the first count, the State did not establish that the value of the stolen items was greater than $1000 and, with regard to the second count, that "[t]he State introduced no evidence that the [d]efendant ever obtained or

exercised control over any property other than what she admitted to possessing" in the first theft count. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain the theft convictions in this case, the State had to prove beyond a reasonable doubt that the defendant, with the intent to deprive the owner of property, knowingly obtained or exercised control over property without the owner's effective consent and that the value of the property was between $1000 and $10,000. Tenn. Code Ann. §§ 39-14-103, -105(3) (2006). Tennessee Code Annotated section 39-11-106 defines "value" as "(i) [t]he fair market value of the property or service at the time and place of the offense; or (ii) [i]f the fair market value of the property cannot be ascertained, the cost of replacing

-6-

the property within a reasonable time after the offense[.]" Id. § 39-11-106(a)(36)(A). If the value of the property cannot be ascertained by the aforementioned criteria, the property is deemed to have a value of less than fifty dollars. Id. § 39-11-106(a)(36)(C). The fair market value of property is a question of fact for the jury. See State v. Hamm, 611 S.W.2d 826, 828-29 (Tenn. 1981). "The market value of the article stolen, and not its original cost, is the true criterion when it is necessary to establish the value of the property in order to fix the grade of the offense[.]" Id. at 829 (internal citations omitted).

In the light most favorable to the State, we conclude that the State presented sufficient evidence that the defendant committed theft over $1000 on two occasions. The victim compiled a list of over sixty items, totaling $7460, taken from his home. The majority of the items were tools or construction materials. The most expensive items were a "log chain" and a generator starter motor and alternator, both valued at $450, and a table saw and an iPod, both valued at $400. The other items were valued between $10 and $350. The victim believed that, given the amount of and size of the items stolen, whoever took his property would have needed to make two separate trips to haul away the stolen items. Additionally, asked why the defendant was charged with separate counts, Detective Randolph testified, "They said there was two trips."

In the defendant's statement to Detective Randolph, the defendant admitted that she was with her son and Hosea Hernandez when they went to a house in Shefey Hollow, ran over a gate, and her son and Hernandez "took a bunch of stuff." The defendant's statement revealed that they went out again later that night and she passed out while her son and Hernandez "went back to the house in Shefey Hollow again and took some more stuff." Detective Randolph clarified that the defendant told him she was passed out in the truck when her son and Hernandez went to the victim's house the second time. Chad Warner testified that the defendant and her husband and son came to his house and tried to "sell some stolen goods," including a table saw, a wet saw, and some chain saws. Given this evidence, any rational trier of fact could have found that the defendant committed theft over $1000 on each trip to the victim's house. The defendant's assertion at trial that she was not with her son and Hernandez when they went back to the victim's house the second time was before the jury, and the jury did not accredit that testimony, as was its province.

The defendant asserts, quoting State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010), that all the evidence linking her to the second theft was circumstantial and that the facts and circumstances were not "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant" and were not "so closely interwoven and connected that the finger of guilt [was] pointed unerringly at the defendant and the defendant alone." However, the Tennessee Supreme Court recently abandoned this language and adopted the federal standard that treats circumstantial evidence the same as

direct evidence and removes the requirement of excluding every reasonable hypothesis except that of the defendant's guilt. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011); see also State v. Sisk, 343 S.W.3d 60, 65-66 (Tenn. 2011). As ascertained above, we conclude that the State presented sufficient evidence for a rational trier of fact to find that the defendant committed two counts of theft over $1000.

The defendant also asserts that because the jury found her not guilty of the second count of burglary and all the lesser-included offenses, the jury could not have found her guilty of the second count of theft because it must have concluded that she did not return to the victim's house. However, consistency of verdict is not required, so long as "the evidence establishes guilt of the offense upon which the conviction was returned." Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973); State v. Hayes, 7 S.W.3d 52, 57 (Tenn. Crim. App. 1999); State v. Tony Scott Walker, No. 02C01-9704-CC-00147, 1997 WL 746433, at *3-4 (Tenn. Crim. App. Dec. 3, 1997), perm. to appeal denied (Tenn. Sept. 21, 1998).

## II. Sentencing

The defendant argues that the trial court erred in its application of an enhancement factor in reaching her sentence.

The trial court conducted a sentencing hearing at which Detective Mike Fincher with the Greene County Sheriff's Department testified that he was familiar with the statistics and reports on aggravated burglaries in Greene County and that as of September 9, 2010, the Sheriff's Department had "worked almost four hundred burglary cases" so far that year. Detective Fincher said that burglaries "tie[d] up many hours of manpower" and were a "huge problem . . . in Greene County." He stated that the danger involved in an aggravated burglary or home burglary was "great" and noted that a seventeen-year-old boy had recently been shot and killed by a homeowner while attempting to burglarize a home. He believed that was the only burglary that had resulted in a death so far that year.

The victim testified that the value of the stolen items was $7500 but that he also had to repair damage to the gate and his home which totaled approximately $500 to $700. He also installed an alarm system with video monitoring and "put in some bollards to stop people at the gate." Those items cost more than $7000. However, he said that the biggest impact of the burglaries was the loss of his sense of safety. On cross-examination, the victim agreed that he spent six to nine months a year out of the country and split his remaining time between Tennessee and Virginia.

In sentencing the defendant, the trial court enhanced the defendant's sentence based on a finding that the defendant had no hesitation about committing a crime when the risk to

human life was high. See Tenn. Code Ann. § 40-35-114(10). The court observed two recent instances in Knoxville where the burglar was shot and noted that the "risk of human life to the burglars and the thieves is probably at this day and time . . . just as great as it is to the homeowner because . . . the homeowners in East Tennessee are armed and ready to take care of business." The court found that none of the defendant's proffered mitigating factors were applicable.

The court noted that the circumstances of the offense were "disturb[ing]" in that the defendant was "out . . . drinking with [her] son . . . and getting passed out drunk . . . and [was] . . . present during the commission of this aggravated burglary[.]" The court observed that it was "off the scale" for the defendant to go with her son while he "push[ed] down a gate and while he's loading stuff out of the house." The court noted that even if the defendant thought they were getting Hernandez's property out of the house, "[she] knew something was up when the gate got pushed down and the posts . . . were broken down . . . . [She] knew what was happening was not that [they] were legally retrieving property." The court further recalled that the defendant allowed her son to store the stolen property at her house for five months and only told him to get rid of it when she "knew the law was going to be coming around over this assault."

In reaching its determination, the court also considered that the sentences imposed should be justly deserved in relation to the seriousness of the offenses, that defendants should receive fair and consistent treatment, that the sentences imposed should be no greater than deserved for the offenses committed and the least severe measure necessary to achieve the purposes for the which the sentences were imposed, and that the sentences should provide an effective deterrent. The court gave "great weight" to the consideration of deterrence in light of the high number of burglaries in the county. The court also found that confinement was necessary to avoid depreciating the seriousness of the offenses. The court considered that the defendant had potential for rehabilitation. The court concluded that the "appropriate sentence considering one enhancement factor, [and] no mitigating factors" was three years.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State

v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

The defendant argues that the trial court erred in enhancing her sentence based on a finding that "the defendant had no hesitation about committing a crime when the risk to human life was high," see Tenn. Code Ann. § 40-35-114(10), because "[n]o weapons were present or used. No person was present other than the [d]efendant and the two men with whom she came. No life was at high risk of being lost due to the [d]efendant's facilitation of aggravated burglary or theft."

Upon review, we note that this is a close case in light of the vast amount of discretion given to the trial court in sentencing, but we agree with the defendant that the trial court's application of this enhancement factor is not supported by the record. The victim was not home at the time and, in fact, only lived at that house, at most, 25% of the year. There was no proof that either the defendant or her accomplices had any weapons. The victim testified that he had a loaded weapon when he proceeded up the driveway to his house upon observing the broken-down gate. However, it was not clear as to when the burglary took place in relation to the victim's return to the house – whether it was five hours earlier or days earlier. Thus, while we do not disagree with the trial court that breaking into others' homes is risky,

it was too hypothetical and speculative to find that there was a high risk to human life in this case. Therefore, with no appropriately applied enhancement factors, the defendant should be sentenced to the minimum in the range of two years on each of her convictions.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the defendant's convictions but modify her sentences to two years on each offense.

_____
ALAN E. GLENN, JUDGE